William Kader, et al. v. Sarepta Therapeutics, Inc., et al. Good morning. Good morning, Your Honor. Oh, I'm sorry, I missed. Good morning, Your Honors, and may it please the Court. My name is Carol Woelke, and I represent the Plaintiff Investors in the Securities Fraud Class Action against Sarepta Therapeutics. I would like to please reserve three minutes for rebuttal time. Your Honors, the Plaintiffs here appeal from, first, the order dismissing the first amended complaint in this case, as well as the orders denying leave to amend and then dismissing the case with prejudice. This case alleges defendants' misrepresentations and omissions regarding Sarepta's preparation of a new drug application for its primary drug candidate, eteplersen, in the year 2014. And specifically, we allege Sarepta's failure for over a year, and despite the FDA's instruction, to get independent confirmation of its dystrophin data, the core data that would be submitted in support of the NDA, prior to the time that it was to be submitted at the end of 2014. And briefly, on the method by which Sarepta was quantifying its dystrophin data was called immunofluorescence. Now, immunofluorescence takes a biopsy of a tissue sample, a muscle sample, and it applies an antibody to stain that sample. At that point, there's imaging created, and a reviewer reviews images to determine how much dystrophin appears to be present in this staining on a slide. And the parties in this case do agree on one thing, and that's we have to put the Plaintiffs' allegations in the context of chronology of what was going on at the time and just prior to the class period to show how Sarepta misled investors in 2014. Now, in 2013, in July of 2013, the FDA did tell Sarepta that they were open to accepting for the NDA this dystrophin quantification method, but they did express concerns that it was obtained, that it was assessed by only one reviewer, and that as a result of this, the image interpretation was susceptible to bias, and that it required strict, scrupulous attention to the blinded analysis. And because of this, the FDA instructed Sarepta again at this time in July of 2013 to confirm with an independent laboratory its immunofluorescence results prior to submitting the NDA in 2014. Sarepta announces this in July of 2013. It tells investors, don't worry, we can do this in time for a 2014 NDA submission. Moving forward closer to our class period, in November of 2013, a related drug trial for the drug Drisoperson fails, and the FDA goes back to Sarepta and says, you know what, our concerns about this dystrophin data have grown. So in February of 2014, and now this is immediately prior to our class period, at the FDA, at the FDA's request, Sarepta provides the FDA with its dystrophin images because the FDA wants to see if it can possibly review them and possibly obtain confirmation of the results. The FDA is unable to do so. It is unable to review what Sarepta has done and come up with the same results. Now despite the fact that the FDA had just gotten the slides and the FDA had just said our concerns have grown, on March 4th, 2014, and this is the first day of the proposed second amended complaint class period, the defendants announce supposedly extraordinary dystrophin data. They say at 24 weeks we're showing 20% dystrophin. At 48 weeks of treatment we're showing over 30% dystrophin. And they further comment in the context of announcing these results, they say this was all done on a blinded basis. These were read on a blinded basis without knowledge if it was a placebo patient or a treated patient, what dose it was, and what duration of treatment. Now this was false misleading at the time it was made. Why? The defendants knew at the time it was made that this data was not procured on a blinded basis. And this is something that investors only learned very much later. It was also reckless to announce this data at the time because the FDA had just warned Sarepta that its concerns about dystrophin had grown and the FDA was in the process of trying to confirm the data itself and had not yet done so. The next important date is April 21st, 2014. And on that day the defendants announced that they were going to be able to submit the NDA by the end of 2014. On this announcement Sarepta's shares rose nearly 40%. The very next day the company announced a $100 million offering that closed on April 23rd. Could you say specifically what is the statement that Sarepta uttered that was false? On April 21st? Well, your best statement that you have. That's one of the difficult things. The district court below asked this question at oral argument. And it would be helpful if we had briefs that says here's what Sarepta said. It's false because here's what the FDA said. So if you could help us with that. While you're answering that question, you might keep in mind our case in the Biogen case, what we stated there. Okay, your honors, very well. So the first statement is on March 4th, 2014. And this is, you can find this in the second amended complaint at paragraph 120. Excuse me. And this is when the defendants commented on what the data, what the dystrophin data showed at that time. And specifically when they said that the dystrophin data was showing over 20% of dystrophin at 24 weeks. And over 30% of dystrophin at week 48. Now, in the proposed second amended complaint and in the briefing documents that were attached in support of that, what we learned was at week 24, in fact, the blinded results, quote, showed essentially no change in dystrophin intensity for any patient. And it was only after the blind was broken, the images were magnified at an even larger scale, double scale, and positive fields, meaning the quantification of certain quadrants of these images was supposed to have been selected randomly. They selected only positive fields to quantify. Excuse me. The statement you said was false, which is the March 4th statement at paragraph 120, didn't use the word blinded at all that you just quoted to me. You said their data showed for over 20%. And it seems to me their data did show that if you looked at their data after the blinding was removed. So I'm still trying to find, you need to have some juxtaposition of what they said and then what the truth is that made each other head on. Sure, Your Honor. So in paragraph 120, if you look at record site page A563, so this was taken from an investor health care conference where the company was touting a tough person basically. In the context of announcing the results and what the data results show, defendant Garabedian does say this was all done on a blinded basis. They were read on a blinded basis without knowledge of it was placebo. And then he goes on to say, and these are what those results were, 20% and 30% dystrophin. So now it seems to me what you're saying, unlike what you initially said for the statement, is the misstatement is saying that they were blinded because the blinded results don't quite show that. But the blinding seems to be a theory that's only advanced in your proposed amended complaint that was not allowed. It isn't advanced in the pleading that was before the district court when it dismissed the complaint. That is correct. So I think what you're arguing now is you're not arguing that the dismissal was improper. You're arguing that the futility finding on denying the motion to amend was improper. Well, I am arguing both. But the blinding has nothing to do with, so if you're arguing both, then I bring you back to my original question with respect to the motion to dismiss your, what is it, your second amended complaint. With respect to the motion to dismiss the first amended complaint, that pass period started on April 21st. And what's in the misstatement there? Yeah, so the statements there was, it was misleading for the defendants to announce that they were going to be able to submit an NDA by the year end of 2014. And it was misleading for them to also say that we can file an NDA now, because at that point, absent verification, the data that they had in 2014 was not capable of supporting an NDA. So can you just, that statement when they said we could file it now, do they say those exact words? They do say those exact words. And I apologize that I don't have a paragraph site, but they say it more than one time. I believe they say it in the April 21st conference call. And then there's a number of investor calls throughout May. Just so I understand, though, there's maybe daylight between the points of, we could file it and the FDA has told us it would be accepted for filing. Right. Okay, so do they represent that the FDA has told us it would be accepted for filing now? I thought they say at one point something like, it's not like the FDA is saying we couldn't file it today, which is a double negative. I don't see them saying ever the FDA has told us it would be accepted for filing now. No, but what they do go on to do, they don't specifically say that, but they do say our data is sufficient standing on its own to support an NDA now. It was not. They knew at that time that absent getting confirmation of those results, it would not be sufficient at that time. Just hold up. That statement, as I understand their position, is technically true in the sense that the data, the data, this was the district court's understanding, is sufficient if it can get verified. No, it's not a problem they don't have the data. The problem is just the assessment of it. So where is the statement that says we could, is there a statement that says it would be accepted for filing now? No, there is not a statement. In fact, what they say is we will have a stronger NDA if we wait until the end of 2014, and we do what the FDA wants. That's true. Right. So where is the false statement? It's an omission there. What they omitted to tell investors was that they were not at that time doing what the FDA wanted. They were not going out and getting independent confirmation of this data. It should have been a relatively simple thing for them to do, by the way, to take their district images, to send them to an independent lab, and to have them reassessed and to say, here, our data is verified. They purposely avoided doing that throughout the class period because we allege, because the way that the study was conducted, they knew it was unlikely to be independently verified by any independent laboratory review. Could you turn for a moment to the motion to amend? Yes, John. You got in January the information that the amended complaint is predicated upon. And the district court was concerned because instead of doing something at that point, you waited to see what the result was on the motion. So it labeled the text as wait and see. What's the response to the district court's concern there? Your Honor, I would say that we acted in good faith. We made the best decisions that we thought we could make for litigation at that time in good faith in balancing the fact that the release of information was ongoing throughout 2016. We knew that the advisory committee hearing that had been scheduled for January was instead going to be held in, well, it wasn't immediately scheduled, but it ended up being reheld in April. We didn't feel that at that time that immediately jumping to amendment was the best tack to take. However, I would say that the later revealed facts that we added to the proposed second amended complaint merely confirm as a factual matter that the inferences that the district court drew in Sarepta's favor on the motion to dismiss were wrong. And specifically that relates to what the FDA said in response to Sarepta's initial announcement of the NDA delay in October of 2014. So now you seem to be saying that this additional information simply reinforced your preexisting claim as opposed to presenting a new claim. It does both, Your Honor. It does both. So what's a new claim? What possible justification was there for holding off on informing the court about it? Again, Your Honor, we knew that that information was going to continue to develop throughout 2016. We did not feel that immediately jumping to amendment at that time was the best course of action. We did act in good faith. That sort of thinking didn't characterize the decision to file the complaint or to file the amended complaint. You knew that there would be lots of stuff that would continue to happen throughout this. Sure, but we knew at the time. Because the ADCOMM committee hearing was canceled in January, we knew it was going to be rescheduled that spring and more relevant information would be coming out. Look, Your Honor, could we have handled this differently? Of course we could, but the First Circuit also has legal tenants that say where a claim looks plausible based on what is known and what is alleged, it should be allowed. That's the Peral case. Even the Genzyme case says that there's a very liberal amendment policy in Rule 15 and it's paramount to guarantee access to the courts. And I would say here where there was a relatively short time period that lapsed between the release of the information and when we brought it to the court's attention, that I would hope investors would not be punished for that, where we did otherwise act in good faith. And if Your Honors don't have anything else right now, I know my initial time has lapsed. Well, I asked you to talk about Biogen, but I guess you ran out of time. Okay. I'll save if you have further questions for me, Your Honor. Thank you. Thank you. Mr. Green, good morning. Good morning, Your Honor. Chris Green on behalf of SREPTA. What I'd like to do is spend a couple minutes talking about high level what happened in this process over the course of the five years. And then I want to get into the misstatement argument and then finish with Sienter. In terms of what happened in the five years, the process by which this drug was developed started in 2012. It continues to this day. There are still a number of ongoing studies. The drug has been approved, and there are continuing confirmatory studies that are unfolding with a broader patient population. So the drug is being used by patients, and it is soon to be marketed and used by patients beyond the confirmatory studies. The plaintiffs are focused on a particular time frame in this five-year period, which is 2014, April to October of 2014. In that time period, all that happened is SREPTA came out in April of 2014 and said, hey, in the context of this long roller coaster journey, we have now met with FDA over the course of the past four or five months, and we are in a position where we can tell you we think we can file an NDA by the end of this year, and they go on. SREPTA goes on in April. Stay with that. Stay with that. One of the arguments I think I just heard was that that was a misstatement because the FDA had told SREPTA that SREPTA would need verification, and SREPTA knew it was not taking steps to obtain verification by the end of the year. Hence, SREPTA must have known it could not make an FDA filing by the end of the year. I think that was one of the arguments. It wasn't clear to me that was made below, but it's being made here now. What's the response to that? I do take their argument to be that there's not any precise misstatement. It's that our predicted timeline for filing the NDA was somehow unreasonable. If they're saying there's a chance we can file it by the end of the year, and they know that there's a condition that's necessary to meet to file it by the end of the year, and they know that they are not going to satisfy that condition, then it would be a misstatement to say that there's a chance that they could file it by the end of the year. Right. So how do you respond to that? There are several points. Number one is they point to nothing and can't point to anything. Number two is they can't point to anything that as of our April press release, or at any time between April and September of 2014, was there a requirement that we do an independent verification of our dystrophin data prior to filing an NDA? There is nothing in the record. In fact, the only evidence in the April to September time period, April to September of 2014, the only evidence of whether that time frame was reasonable or not is actually the FDA's own statements in July. In July, the FDA issued a statement, an unusual statement, and this is the We the People response, July 30th. This was a day after the FDA had sent Sarepta a letter saying, hey, we need some further studies on the dystrophin. Sarepta Therapeutics, and I'm reading directly from the statement, there's one critical sentence. Sarepta Therapeutics has publicly announced its intention to file a new drug application for Eteplersen by the end of 2014, as well as plans to initiate several additional clinical studies with Eteplersen later this year. As mentioned above, we are willing to explore the use of all potential pathways for the approval of drugs for Duchenne muscular dystrophy, including accelerated approval, as appropriate. Nowhere in this formal statement do they take issue with the fact that Sarepta has said we think we can file the NDA. They don't know that Sarepta is not going to comply with the condition. How would they know? If the allegation is that there's a condition on Sarepta, being able to meet that deadline that Sarepta was not complying with, how does that statement help you? FDA wouldn't know whether you're complying with the condition. They just know they imposed the condition. No, no, no. The FDA knows exactly where we are in this process, so let me back up and explain that. So what happened is, let me give one minute of context here. Going back to November of the prior year, the FDA was very concerned because of the failure of a competitor drug. We then meet over four or five months with the FDA to say, no, no, no. Our drug can work. We can prove it because our boys are taking this drug and they're walking longer, and we think we've got some indications of dystrophin that are sufficient. So we announced in April, based on the discussions with the FDA, that we think we can get this done. Among other things, we have disclosed to the market in April very clearly that the FDA is very skeptical of our dystrophin data. We were very clear about that. Not quite the words used. We remain skeptical and uncertain whether it can even serve as a surrogate endpoint. Those are the words that the FDA used, and we quoted them back to the market verbatim. We just relayed that verbatim. Then what happened, and we said, we're going to work with the FDA in collaboration to figure out how they can get comfortable with our dystrophin data. Then what happens is on May... It's helpful, but I don't want to break time by just going each piece. In April, is it when you say FDA is not saying we couldn't file today? Yep, so what happens is... How can that statement be true? We issue... Fair. In April, we issue this press release, and then there are analyst calls right after. Investors are trying to understand, okay, we understand that there's a lot of concern on the FDA's part about whether this can even be a surrogate endpoint, but it looks like you think you can file an NDA. We say, well, look, let's be very clear about this. We can file an NDA whenever we want. What we're trying to do is file a successful NDA. No, no, that's different. The statement that concerns me is it says it's not like the FDA... I wish I had the exact statement handy. I have it here. You know what I'm talking about? I know exactly what you're talking about. What's it say? It says, I'm paraphrasing here, but the FDA didn't say we're not telling you you can't submit an NDA tomorrow on the existing data set. So how is that true? Because the FDA had said you can't tomorrow because you've got to get... They were saying you've got to get a reassessment, or is that not... Yeah, no, no, no. You think the FDA was saying you could file it tomorrow? No, here's... Let me back up even more here. Because we're on an accelerated approval pathway, we are in uncharted territory from the FDA's perspective, right? And that's just because it's a serious unmet medical need. And so we are in the normal process. You can't file an NDA until your work is complete, right? All of your studies have to be complete, and then you file it. And it's a very non-fluid kind of binary process. Work complete, then you can file. Work not complete, you can't file. We're on an accelerated pathway, which is far more fluid. And the FDA even says multiple times in its own statements that we could file portions of an NDA and have the FDA start reviewing portions. They would do a rolling review. They said that even in their October 2014 press release. The FDA said that. We're just in a... Because kids are dying, they say, we'll review whatever you've got that you want to file as part of an NDA. So there's no... What is the idea of accepted for filing? Does that concept apply in the accelerated? Yes. Yep. So what happens... That's a great question and critical here because what ultimately happens is we decide, and it's consistent with that statement you were focused on, we decide rather than filing portions of this, we're going to file one full clean package that is persuasive. It's as persuasive as we can be on what's going to be clearly a close scientific call here. And we did that in June of 2015. And then what happened was the FDA reviewed that clean package, and two months later in August they accepted it. That means they're saying it's complete. Yeah. That's what they're doing. When they say we've accepted... So what I'm saying, in that statement there, your proposition is that statement would not have been understood by an investor as a statement that we were going to file it so that it would be accepted for filing. It was just we were going to file something that might not have been accepted for filing? Right. They're saying we can file it and they can start reviewing it and make us continue to do work, but they're not going to accept it until we get all this done. And accepting for filing is different still than approval. For sure. So accepting for filing means nothing other than, okay, you've now given us all the work that we now need to do for approval. We're clear about that in our disclosures, by the way. We say over and over again, filing an NDA doesn't accomplish what we need to. Even the FDA accepting the NDA doesn't accomplish what we need to. We actually have to ultimately get approval. And even there, Your Honor, accelerated approval doesn't actually accomplish what we need to. We're in that different of a process here where they could grant accelerated approval and then while we're doing these confirmatory studies and the kids are taking the drugs for a longer and longer period of time, it could happen, this is conceivably possible, it could happen where they say, you know what, we're actually now seeing safety issues arise where we don't think it's effective. Can I ask you something? In that April, is it April? The FDA, the lengthy statement by the FDA. The October? Yeah, October 2014 statement by the FDA. When the FDA says it would be critical to our assessment that there be additional patients. You know that passage? I do. Yeah. Is the FDA there talking about approval or acceptance for filing? Right. So that is after that NDA is filed and accepted. It has been accepted at that point? It's been accepted. And then the next steps in the process are the FDA says, okay, the next thing we need to do is determine whether to grant accelerated approval. And while all of that is unfolding, while the FDA is already unfolding. So that statement is referencing approval as opposed to acceptance for filing? Not only is it referencing approval, Your Honor, it's representing ultimate approval, not even accelerated approval. So just so I understand, on your account of things, the FDA is not in a position to prevent you from filing? Correct. So your view is all these statements about filing, unless they said it would be accepted for filing, can't possibly be misleading? Because we can always file a gum wrapper if we wanted to. We can file. Is that the idea? And your idea is that that's how investors would have understood it? Correct. And the amount of dialogue between investors and the company at that time is immense. And what happens in September, this is the shift. It's subtle in many ways, and it's a nuance in the context of this five-year process. But they say, we've gone to the site, and the FDA has looked at the site themselves. They didn't quite get comfortable. We're now requesting that you do an independent verification with third parties and try to get it done as early as possible. So they said, get moving on that. That's what they tell us at the very end of July. And then in September, we have a meeting with them, the whole purpose of which is to determine what actually needs to be in the NDA. But if they said in July that we need independent verification and Surepta wasn't then doing that on a schedule that would get it done in October, doesn't that render false the continuing assertions that they're going to file an NDA by October? No, and this is why there's focus on that August 7th earnings call. Because otherwise, Surepta doesn't speak about this process until September. So there's only one earnings call. And in that earnings call, the CEO of Surepta says, we remain on track, in our view. We're going to meet with the FDA in September, and we're going to talk specifics about what's required for the NDA filing. We remain in collaboration with them about precisely what needs to be done for approval, not for filing the NDA. And then in September. So again, you're saying this statement in July by the FDA about a need for verification is not with respect to filing, but is with respect to approval. Correct. It's not even with respect to acceptance of filing? It's not. They say, see, that's a good question. So that's a good question. And let me get his exact words. So this is what the CEO says in this August 7th call. They say, we remain on track. Next paragraph, we're meeting with the NDA to discuss what needs to be in the actual submission. And then he says, and this is the paragraph that matters, the agency recently completed a site visit with Nationwide Children's Hospital in Columbus, that's where the dystrophin was read, and met with the leadership and staff of the histopathology lab that conducted our dystrophin analysis and quantification. And we continue to work with the FDA to provide greater assurance of the quality and reliability of our dystrophin data in anticipation of a potential NDA filing decision and potential NDA review next year. So at this time, what he says is exactly what Sarepta's thinking based on the request, which is we can file the NDA by the end of this year. We need to do this independent verification while they're considering it so that we can get a decision next year. And then all that happens, this is what I want to emphasize, all that happens is then six weeks later when we meet with them in September, they say, no, don't do it that way. Don't do it procedurally that way. Get the independent verification done before you even file it. And we say, okay. What do you say about the blinding? You know, it's the futility argument on the motion to amend. It does seem there's repeated references to blinding, which to me seem to be referring not to the placebo study but to the actual assessment of the results. And then it seems the FDA announces in January that, in fact, the key data set from back in July was not a blinded data set. So threshold comment. We actually don't understand the argument that the plans are making on the blinded versus non-blinded. There's a stray comment in a document that's probably not properly before the First Circuit, but a stray comment about an FDA scientific disagreement with Sarepta about whether it was blinded or not blinded, and they said we, the FDA, did not think it was blinded. But to put all of that in perspective, Your Honor, the ultimate information on which this drug was approved and is now being taken by- No, but back to July. There's repeated statements by Garabedian, if I'm pronouncing his name right, that these are blinded, which is a big deal in science, whether it's blinded or not. And now there's a factual allegation, arguably supported by an FDA document, that that was false, that they were not blinded. How do we deal with that? Sarepta believed all along the way and to the present that it was blinded. What that is is purely a scientific disagreement. Can I just ask something? You don't seem to deny in your brief the allegation as described in the plaintiff's brief that although it was initially blinded, when the stain is looked at, the person looking at it knows he's looking at a selected group of stains. Is that right? Correct. So that is how it happened. Oh, correct. So that's what they mean by broke the blind. You just think that doesn't mean it's not blinded. Right. So the question would be if one were to think that it's misleading to characterize a process in which the person doing the review of the stain knows that these are a selected group of stains that look promising, if it's misleading to characterize that as blinded, you'd have a problem. Well, what I would say is there's disagreement even within the FDA review team about whether it was blinded or not. What you're saying to me is that you should still count that as blinded. I'm just asking you a separate thing. Suppose I disagree with you on that. And I think if it was misleading to characterize something as blinded without saying, hey, just so you know, this blinded study involved the reviewer looking at a selected group of promising stains. Would you still have a problem? I'm not sure I'm following your last question. We both seem to agree on the way the study was done. Right. Which is that at the time they look at the stains, it's not totally blind in the platonic sense because actually this is a set of stains that have been selected as potentially promising that they're looking at. Correct. I agree with that. Okay. You nonetheless characterize it or the company characterized the study as blinded without saying in characterizing it as blinded that the way it works is we look at a selected group of stains. One might think that's misleading. You might say that's not. That's a scientifically accepted term. That's what blinded means. Fine. But if that was misleading, you'd then have a problem by calling it blinded, right? If it wasn't within the range of kind of scientific disagreement and it truly was not blinded in the platonic sense, then there would be an inaccurate statement. Just to say, I don't think it would be a material misrepresentation in the context of a securities case, especially this one, because all of that, all of the review of the dystrophin data, ended up being utterly irrelevant for purposes of approval. What this drug was approved on was the basis of kids walking, and you will probably find this interesting, the references and the materials to natural history studies, which is unclear kind of on its face unless you kind of live in this world, but what that is is essentially a virtual placebo. So they say, we don't have enough kids to have a placebo group, so what we're going to do is our 12 kids that are actually receiving this drug, we're going to go out and find in the world, based on exquisitely detailed doctor records, medical records, the equivalent of twins for those kids. And these are kids whose muscles are deteriorating rapidly and are not taking the drug, and we're going to compare the kids who are taking the drug with their virtual twins who are not taking the drug. And it was on the basis of that clinical proof that the drug was ultimately accepted for filing and then approved on an accelerated basis. And so whether the review of the muscles in the arm, it didn't ultimately matter at all in the context of this. It's the clinical efficacy, and the kids are walking longer than their, again, their virtual twins out in the world who are not taking the drug. And so I would agree with you that it would be an inaccurate statement, but not here because it was within the range of scientific disagreement and utterly irrelevant for purposes of approval. And what authority do you point us to where we could say it's reasonable to think that this was still blinded? Well, there's a number of cases in the First Circuit, and I'd point to Ovium and a number of other cases that say you've got to allow for some regulatory back-and-forth, particularly where there's scientific disagreement. That wasn't my question. To have back-and-forth, you need two sides. They say this is not blinded, so to have a back-and-forth, you need something that you can point us to that can describe what Judge Barron described as being blinded. What is that that you would point us to so that we have a back-and-forth? I don't think I can point to some... Because it doesn't sound like it was blinded. Well, it's blinded in the sense that the reviewer doesn't know who the kids are, whose muscles they're looking at. No, but he's got a wink-wink that these are the promising ones. Well, I don't think that's in the record at all. I don't think the plaintiffs have alleged some wink-wink. That's what the whole allegation is. The FDA's concern was exactly this, that it broke the blind. Well, it broke the blind only in your, I like your terminology, in a platonic sense, that it wasn't the full universe of biopsies. But the FDA thinks that when you say broke the blind, he's not talking Plato. He's just saying as a scientist, you passed the blind. He's saying that the reviewers weren't looking at every single one of the biopsies. It's still blind. They don't know whose muscles. They still don't know whose muscles they are. I am going to have trouble pointing to some kind of FDA scientific study that defines exactly the range of reasonable scientific disagreement here, but certainly this issue, maybe it's just a tree falling in the forest, this issue about whether the review was blind or not in that language never came up until January of 2016. It never came up. So what the FDA was challenging us, challenging Surepta on, was not whether it was blind or not. They were just saying, we're not even looking at, we've only got 12 kids here, and even looking at the biopsies, we're just not, we're not seeing quite enough dystrophin production to conclude that that can be a surrogate endpoint. So keep on working on the natural history data. Keep on working on the clinical data points. And we're going to go to the site in the summer of 2014, we're going to go to the site and we're going to talk to the reviewers ourselves and see exactly what they were doing. But this whole blind versus non-blind is, it really feels a red herring. It just never came up in any of the back and forth with the FDA again until there's a straight comment about it in January 2016, two years later. So let me, if I could with. I think your time is up. Thank you, Your Honors. Thank you, Your Honors. Regarding the study blind, the FDA learned at the site visit in May of 2014 about the process by which the data was reviewed and the fact that the blind was broken. There's no disagreement within the FDA review team that study 201-202 was not properly blinded. There's no disagreement about that. Let's assume that we've got a misstatement by them on the blinding, repeated misstatement on the blinding. What's your response? Because we still have to then determine the futility issue. A misstatement is one of the elements. As I understand the backup argument that Sarepta has is basically materiality or perhaps even loss causation. What's this got to do with this case since it's not as if in October it was suddenly announced that there was no blinding and the stock dropped? Right, well, on materiality first, dystrophin was the primary efficacy endpoint of study 201-202. So to suggest that investors would not have cared at this time in 2014, that when that study data was assessed on a blinded basis, it showed zero dystrophin production. So how about loss causation? So it's tied into loss causation because had Sarepta gone out and gotten the independent confirmation of the results that it was directed to do, it would have known that it could not announce these results in March of 2014 and claim that they were blinded. They never would have even been able to get there. And loss causation is not something that has been fully briefed on this issue because we didn't get to that point, but it's directly tied to the issue of independent verification. And, again, the reason that Sarepta didn't want to go out and get independent confirmation was because they knew it was unlikely to be confirmed. So you also have to overcome the timeliness issue, right, for this to matter? Yes. So can we just go to the First Amendment, to the aspect of the complaint that's not subject to a potential timeliness objection? Yes. So the First Amendment complaint, I'm sorry, I didn't mean to cut you off. Well, I just wanted to, in my, or the back and forth the panel was having with your opponent's counsel, as I understood them, they were saying that the FDA's various representations about the need for additional assessments and the like don't conflict with anything Sarepta said because either those statements related to ultimate approval, and Sarepta never represented that they would, that the FDA said you would get ultimate approval, full stop with what they had put forward, or all Sarepta was representing is that they could file something, not that it would be accepted for filing. And since you can file anything, that can't be misleading either. Could you just address those two points? Sure, Your Honor. Well, of course, Sarepta was saying to investors, we want to file something that is going to be accepted, and that's the reason why we're going to wait. Sarepta went further. There were specific analyst questions regarding dystrophin. Well, what does the FDA want to see regarding dystrophin? And Sarepta answered with these very vague responses. They want to collaborate with our site team to see how it was collected, it's going to be an ongoing thing, we're going to make the FDA comfortable with this. The FDA didn't merely want to meet the scientists and understand how it was collected. The FDA had already said we're concerned about this because they know there was only one. What we want is independent confirmation of this. Absent that verification, the data would not be sufficient to file the NDA at that time. To file or to be accepted for filing or what? Right. Well, in the context of Sarepta telling investors, the reason why we're waiting until the end of 2014 is so we can submit a really strong NDA that the FDA is comfortable with and not tell them at that time, but by the way, we're not doing the one major thing that the FDA has asked us to get comfortable with. And just one last thing on this idea of collaboration. Collaboration never replaced the need to get independent assessment. And regarding the last thing on the first amendment complaint, July of 2014 at the very latest, at the very latest, defendants were reckless with respect to getting confirmation at that time. The suggestion that Mr. Green just made that it was reasonable for them to think that this was still something that could come after an NDA filing in light of the July 2013 instruction, in light of the FDA's inability to confirm it itself, in light of the fact that in July 2014 it said, do this at the earliest possible time. Nothing in that suggests that this could be done later after the NDA is filed, especially where it was the primary efficacy standpoint of the study. I think my time is up, unless Your Honor is having issues. Yes, it is. Thank you.